UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CASE NO. 3:06-CV-657-R

ORION INVESTMENTS, LLC,                                        PLAINTIFF

v.

MCBRIDE & SON HOMES LAND
DEVELOPMENT, INC.,                                             DEFENDANT

## MEMORANDUM OPINION

Plaintiff Orion Investments, LLC and Defendant McBride & Son Land Development, Inc. have filed motions for summary judgment (Docket #24 and 25). Both parties have filed a response (Docket #29 and 30). Both parties have filed a reply (Docket #43 and 44). This matter is now ripe for adjudication. For the reasons that follow, Plaintiff's Motion for Partial Summary Judgment is DENIED, and Defendant's Motion for Summary Judgment is DENIED.

## BACKGROUND

Olympia Homes, an affiliate of Plaintiff Orion Investments, is the original developer of a subdivision in Louisville, Kentucky known as the Glen Lakes Subdivision ("Glen Lakes"). Plaintiff is a real estate holding company that is the current owner of Sections 3 and 4 of Glen Lakes. Defendant McBride & Sons Homes Land Development is the current owner of Section 1 of Glen Lakes. Defendant entered a contract for purchase ("Contract") with Plaintiff to purchase Sections 3 and 4 on July 28, 2005.

Brush Run Watershed, LLC entered into a Recapture Agreement with the Louisville/Jefferson County Metropolitan Sewer District ("MSD") concerning the development

1

of sewer facilities for Glen Lakes ("Recapture Agreement"). This agreement was entered on January 10, 2005. The Recapture Agreement covers sewer line development for multiple sites, including Glen Lakes.

When a line is to be added to the sewer system under the Recapture Agreement, the developer and MSD enter a Lateral Extension ("LE") Agreement. Brush Run and MSD entered two LE Agreements to connect Section 3 to the overall sewer system. LE 15116 concerned the Brush Run Interceptor. LE 15097 concerned the Johnson Road Pump Station and Force Main.

Louisville Ordinance § 94.82(A)(3)(c)(2) states that "where a development exceeds 100 dwellings in a given area, a secondary supply may be required by the local water utility." In this case Louisville Water Company ("LWC") is the utility company responsible for the subdivision's water supply. Sections 1, 2, and 3 of Glen Lakes combined exceed 100 lots.

Section 15 of the Contract required that certain conditions be fulfilled before Defendant would be required to close on Section 3 of Glen Lakes. If the conditions could not be fulfilled so that the parties would close by December 31, 2006, then Defendant reserved the right to terminate the Contract.

On December 1, 2006, Defendant notified Plaintiff that it was terminating the Contract pursuant to section 15. Defendant stated that Plaintiff had failed to satisfy the contractual conditions found in sections 14(a) and 14(b) of the Contract.

Defendant argues that Plaintiff failed to complete three conditions under the Contract at the time it was terminated. First, Defendant states that a pump station of the sewer main was running on a gas generator, and not connected to the electrical system. Second, Defendant states that the sewer system was not accepted by MSD. Finally, Defendant states that a secondary

2

water line was not connected to Section 3.  Plaintiff filed suit on December 22, 2006, requesting declaratory judgment and specific performance, arguing that none of the above conditions were required by the Contract.

Certain facts are not in dispute.  Both parties agree that the pump station was being run by a gas generator on December 1, 2006.  Both parties agree that MSD did not send a letter formally accepting LE 15116 until December 8, 2008.

There is also no dispute between the parties that Section 3 was connected to a water main.  Defendant argues that the Contract did not require a primary connection between a water main and Section 3, but was instead a secondary line under the 100 lot rule.   It is undisputed by the parties that a secondary water line was not completed.

Kentucky contract law controls the interpretation of the Contract.  Both parties argue that under the express conditions of the Contract, it is entitled to judgment as a matter of law.

## STANDARD

Summary judgment is available under Fed. R. Civ. P. 56(c) if the moving party can establish that the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."   In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact."  *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).  The test is whether

3

the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## DISCUSSION

### I.  KENTUCKY CONTRACT LAW

"[T]he construction and interpretation of a contract, including questions regarding ambiguity, are questions of law to be decided by the court." *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 105 (Ky. 2003). "In the absence of an ambiguity, Kentucky courts will enforce a written instrument strictly according to its terms and will assign those terms their ordinary meaning." *Davis v. Siemens Med. Solutions USA, Inc.,* 399 F. Supp. 2. 785, 792 (W.D Ky. 2005). Under Kentucky contract law, a contract is ambiguous "if it is reasonably susceptible to different or inconsistent interpretations." *Id.* If a contract is unambiguous, the Court cannot reference extrinsic facts to determine the meaning of the contract. *Id.*

If a contract is ambiguous, then the intentions of the parties in making the contract is to be determined by drawing reasonable inferences from the circumstances of the contract. *Cook United, Inc. v. Waits*, 512 S.W.2d 493, 495 (Ky. 1974). If the Court determines that the Contract

4

is ambiguous as a matter of law, "areas of dispute concerning the extrinsic evidence are factual issues and construction of the contract becomes subject to resolution by the fact-finder.'" *Lexicon, Inc. v. Safeco Ins. Co. of Am., Inc.*, 436 F3d 662, 670 (6th Cir. 2006); *see also Equitania Ins. Co. v. Slone & Garrett, P.S.C.*, 191 S.W.3d 552, 556 (Ky. 2006) ("Certainly, if the writing is ambiguous, the factual question of what the parties intended is for the jury to decide.")

## II.  Section 14(a) Sewer Line

Under the Contract, the "Trunk Line" is defined as a "public sanitary sewer service trunk-line main."  Section 14(a)(i) of the Contract states that there is not a Trunk Line located on or servicing Section 3 or 4.  Section 14(a)(ii) states that under the Recapture Agreement, Brush Run has agreed to develop a Trunk Line, located to the west of Section 3, to provide sanitary sewer service to Glen Lakes, as well as other developments.  Section 14(a)(iii) states that Defendant will be entitled to tap-in to the Trunk Line to serve the Sections 3 and 4, conditioned upon the payment of applicable fees.  Finally, section 14(a)(iv) states that it may be necessary for Plaintiff to obtain off-site easements from the owners of property adjacent to the property so that Plaintiff may extend a "Sewer Line" from the Trunk Line to Section 3.

The term "Sewer Line" is also a term defined under the Contract.  The Sewer Line is "a sanitary sewer line" running "from the off-site Trunk Line to the most western border of the Section 3 Property in a location approved by MSD."  Under the Contract Plaintiff was responsible for obtaining any necessary easements to construct the Sewer Line, as well as being responsible for constructing the Sewer Line itself.

Finally, section 14(a) specifies certain requirements for the Sewer Line:

The Sewer Line shall be (w) of a capacity sufficient to serve the lots in the Section 3 Property and the Section 4 Property as shown on the Revised Preliminary Plain, (x) constructed in a good and workmanlike manner, and in accordance with plans and specifications which satisfy the applicable requirements of the Governmental Authorities and which are approved by such Governmental authorities, (y) fully functional, and (z) accepted by the applicable Governmental Authorities or utility company.

## A.  Fully functional under section 14(a)

Defendant first argues that the Sewer Line was not fully functional when it terminated the Contract.  Specifically, Defendant argues that the Sewer Line was not fully functional because the pump station was being run by a gas generator.

The Sewer Line transfers waste to the Trunk Line.  The Trunk Line collects waste from multiple sites, including Glen Lakes, and conveys it to an MSD treatment facility with the assistance of a pump station.  The pump station is designed to have a gas generator, but it is intended to be used as back-up electrical power, not as the primary power source.

The LE Agreement between MSD and Brush Run which covered the Trunk Line and Sewer Line was signed on November 2, 2005.  The LE Agreement that covered the pump station was signed on January 13, 2006.

The issue is whether the Sewer Line was not "fully functional" under the Contract because the pump station was power by a gas generator.

By definition, the Sewer Line is separate from the Trunk Line, because the Sewer Line is specifically defined as a sanitary sewer line connecting the Trunk Line with Section 3.  The final paragraph of section 14(a) only requires that "The Sewer Line shall be . . . fully functional." There is no requirement that the Trunk Line be fully functional.

The purpose of the Sewer Line is for sewage to flow from the development into the Trunk Line.  Therefore, the Sewer Line was fully functional when it was completed and ready to

accept flow.

Even if the pump station, Trunk Line, and Sewer Line formed a single unit, so the pump station must be functional for the Sewer Line to be functional, Defendant would still not be entitled to terminate the Contract.  The Contract does not require the pump station to be connected to the electrical system.  The term "functional," in its ordinary meaning, is defined as "capable of operating."  Under the facts of this case, the pump station was capable of operating when it was hooked up to a generator.  Sewage was fully capable of flowing from the Sewer Line, to the Trunk Line, and then being pumped to the treatment facility.  The pump station's source of power does not change this analysis.  Therefore, the Sewer Line was fully functional at the time Defendant terminated the Contract.

## B.  Accepted by the applicable Governmental Agencies under section 14(a)

Defendant next argues that it was entitled to terminate the Contract because the Sewer Line was not accepted by MSD until December 8, 2006.  Under section 14(a), "The Sewer Line shall be accepted by the applicable Governmental Authorities or utility company."

Defendant argues that the Sewer Line was accepted only when MSD formally accepted the LE Agreement covering the Sewer Line.  The parties agree that LE 15116 was the LE Agreement that included both the Trunk Line and the Sewer Line.

Plaintiff argues that the Sewer Line was completed and accepted before MSD formally accepted LE 15116.  Plaintiff believes that the Sewer Line was accepted when Roy Flynn, an MSD developmental engineer, notified Plaintiff in writing that the sewer service outlet was available to serve Section 3 and 4, or when an MSD inspector approved of the Sewer Line as-built.

7

Plaintiff's interpretation is a reasonable interpretation under the language of the Contract. The Contract only called for the acceptance of the Sewer Line.  There is no requirement under the Contract that the Trunk Line be accepted before Defendant closes the deal.  Since only the acceptance of the Sewer Line was required by the Contract, it is a reasonable interpretation to find that the Sewer Line could be accepted by MSD without involving the completion of the Recapture Project as a whole.

Furthermore, section 14(a)(iii) which states that Defendant "will be entitled to tap-in to the Trunk Line to serve the Property conditioned upon payment by Purchaser of the applicable Recapture Fees due under such Recapture Agreement."  This supports Plaintiff's argument that the Contract contemplated a situation where Defendant had possession of the property, but was not yet connected to the sewer system as a whole.

Under the Contract, it is a reasonable interpretation that MSD could have "accepted" the Sewer Line, before it was even fully connected to the Trunk Line, so long as the Sewer Line was built and accepted under the requirements of section 14(a).

However, it is also a reasonable interpretation that "accepted," as used in the Contract, requires formal acceptance of the Sewer Line by MSD.  If "accepted" does mean formal acceptance of the LE Agreement concerning the Sewer Line, it is not Defendant's responsibility to structure the agreement to allow formal acceptance of the Sewer Line before the Trunk Line or pump station met all of MSD's requirements for formal acceptance.

As the Court finds that the term "accepted" is reasonably susceptible to two different interpretations, the intentions of the parties must be determined by examining the circumstances surrounding the Contract.   Such a determination requires the drawing of reasonable inferences

8

from the conduct of the parties, which must be made by the fact-finder upon hearing all the applicable evidence.

## III.  Section 14(b) Water Line

Section 14(b) of the Contract is structured similarly to section 14(a).  Section 14(b)(i) notes that there is not a Water Main, defined as public water service main, located or servicing the property.  Section 14(b)(ii) states that it may be necessary for Plaintiff to obtain off-site easements from the owners of property next to the Property to extend the Water Line (as defined later) from the Water Main to the Property.

The Water Line is defined as "a water line . . . from the off-site Water Main . . . to the boundary of the Property."  The Water Line is to be connected to the Water Main "located to the west of the Property or to the south of the Property along Shelbyville Road, or another water main as approved by [LWC]."

Under section 14(b) Plaintiff was required to obtain any necessary easements to construct the Water Line.  Plaintiff was also responsible for the construction of the Water Line.

Finally, like the Sewer Line, completion of the Water Line required the fulfillment of certain conditions:

> The Water Line shall be (w) of a capacity determined by LWC to be sufficient to serve the lots in the Section 3 Property and the Section 4 Property as shown on the Revised Preliminary Plain, (x) constructed in a good and workmanlike manner, and in accordance with plans and specifications which satisfy the applicable requirements of the Governmental Authorities, (y) fully functional, and (z) accepted by the applicable Governmental Authorities or utility company.

## A.  Completion of the Water Line under section 14(b)

Defendant argues that at the time the Contract was entered the "Water Line" referred to in section 14(b) was a secondary water line required under the 100 lot rule, not the primary water

9

line serving Section 3.  Plaintiff contends that all the contractual conditions found in section 14(b) were complete when the water line connecting Section 2 and Section 3 was completed. Upon examining the Contract strictly according to its terms, the Court finds that Plaintiff's interpretation is correct.

Section 14(b)(i) begins by stating that there is no water service main serving Section 3 or Section 4.  This indicates that the intention of the parties was to remedy this situation.  The lack of water service was corrected when the primary water line was constructed and installed.

The Contract does not reference the "hundred lot rule," nor does it mention the word "secondary."  There is nothing in the Contract that indicates the parties intended the Water Line to be a secondary water line.

Finally, Plaintiff's interpretation is supported by the similarities of sections 14(a) and 14(b).  Sections 14(a) and 14(b) contain almost identical language in describing the conditions necessary for the construction of the Sewer Line and Water Line.  Section 14(a) did not require the construction and installation of a secondary sewer line.   In giving them a similar interpretation the Court is unable to find that the Water Line was the secondary water line.

Defendant attempts to rely on extrinsic evidence to support its argument that the Water Line under the Contract was a secondary water line.  Under Kentucky contract law, the Court may only rely on extrinsic evidence if the term "Water Line" is subject to more than one reasonable interpretation under the plain language of the Contract.  In this case, when the terms are given their ordinary meaning and the Contract is interpreted as a whole, the only reasonable interpretation is that the "Water Line" was the primary water line. As the Contract is not reasonably susceptible to Defendant's interpretation, it is not necessary for the fact-finder to

draw inferences from the extrinsic evidence to determine the parties' intentions.

It is undisputed that the primary water line was completed by May 19, 2006.  Therefore, Plaintiff had satisfied the conditions contained in section 14(b) of the Contract before the closing deadline.

Furthermore, the 100 lot rule is expressly a permissive rule.  The rule provides that the local water company *may* require a secondary source.  It also applies to the development as a whole, and not to any particular individual section.  Plaintiff argues that it has reached an agreement under which LWC will require a secondary water source sometime in the next three years.  As the rule is a permissive rule, the 100 lot rule was satisfied by this agreement.  As such, even if the requirements of the 100 lot rule were incorporated into section 14(b), such a requirement has been satisfied.

## IV.  Equitable Arguments

Plaintiff argues that even if Defendant is correct in its argument that the Contract required the Sewer Line to be formally accepted by MSD, Plaintiff is entitled to equitable relief. Defendants concede that all of the requirements for the Sewer Line were completed by December 8, 2006.  Defendants argue that since this was 7 days after the December 1, 2006, deadline, Plaintiff cannot be rely on equitable arguments to support its motion for summary judgment.[1]

Under Kentucky law, "[i]f a time for performance is specified, and time is of the essence

_____

[1]The Court notes that Plaintiff argues that the deadline for acceptance of the Sewer Line was December 4, 2006.  As neither party has argued that the three-day difference would have any effect on the ultimate outcome of this case, the Court declines to decide the issue at this time.

of the contract, a strict performance in point of time is necessary, unless waived; but, if time is not of the essence of the contract, a strict performance is not ordinarily regarded as essential; it being sufficient if the performance is within what is under the circumstances a reasonable time of the date stipulated."  *Browning v. Huff*, 263 S.W. 661, 662 (Ky. 1924).  In this case, the parties have a provision in the Contract stating that "it is agreed by and between Seller and Purchaser that time is of the essence in this contract."

However, it is a different issue to hold that an express "time is of the essence" provision is an absolute bar to any remedy, no matter what the equities of the case.  *See* 12-64 Corbin on Contracts § 1177 ("Specific performance has also often been decreed in disregard of express agreements for forfeiture for delay"); Williston on Contracts § 46.11 ("If the forfeiture is egregious enough, or the delay slight enough and the breaching party sufficiently innocent, even a negotiated time is of the essence clause will yield to the demands of equity.")  Defendant has offered no case law where a Kentucky Court has held that a "time is of the essence" provision forecloses all possibility of equitable relief.

The burden is on Plaintiff to show that equity requires that it receive specific performance.  The parties intentionally added a "time is of the essence"clause to the Contract. Moreover, both parties took actions during performance of the Contract which showed their intent to meet the December 31, 2006, closing deadline.  Plaintiff must therefore show that to enforce the parties agreed upon deadline would be inequitable.  There is insufficient information concerning the magnitude of Plaintiff's potential forfeiture, the innocence of Plaintiff's conduct in the alleged breach, or the purpose behind the "time is of the essence" clause for the Court to make such a finding at this time.

**V.  Conclusion**

The Court finds that when the Contract is interpreted strictly according to its terms, the Sewer Line was fully functional and the Water Line was completed at the time Defendant terminated the Contract.

When attempting to enforce the Contract strictly according to its terms, the Court finds the requirement of section 14(a), that the Sewer Line be accepted by the applicable governmental agencies, to be reasonably susceptible to different interpretations.  Therefore, Kentucky contact law requires that the intentions of the parties at the time of contracting be determined from the extrinsic evidence concerning the intentions of the parties.

<strong>CONCLUSION</strong>

For the above reasons, Plaintiff's Motion for Partial Summary Judgment is DENIED. Defendant's Motion for Summary Judgment is DENIED.

An appropriate order shall issue.